In re Lorraine MOCCO, Peter Mocco, Village Townhouse Estates, Inc., Knob Hill Victorian Estates, Inc., and Liberty Harbor North, Inc., Debtors.

Bankruptcy No. 94–31932.

United States Bankruptcy Court,
D. New Jersey.

Jan. 6, 1995.

336

Richard D. Trenk, Bruce D. Buechler, Ravin Sarasohn Cook Baumgarten Fisch & Baime, Roseland, NJ, for debtors.

Jay L. Lubetkin, Ravin Greenberg & Marks, Roseland, NJ, for Official Committee of Unsecured Creditors.

Craig J. Donaldson, Riker Danzig Scherer Hyland & Perretti, Morristown, NJ, for First Fidelity Bank, N.A.

Michael S. Kopelman, Contant Scherby & Atkins, Hackensack, NJ, for Township of North Bergen and Municipal Utilities Authority.

Kathy Stroh Mendoza, Deputy Atty. Gen., Newark, NJ, for State of N.J. Dept. of Environmental Protection.

Ira C. Kaplan, Benenson & Scher, Millburn, NJ, for Coolidge Knob Hill, L.P.

## OPINION

WILLIAM H. GINDIN, Chief Judge.

### PROCEDURAL BACKGROUND

This matter comes before the court on the motion of First Fidelity Bank, N.A. ("FFB"), successor-in-interest to the Federal Deposit Insurance Corporation, as receiver for The Howard Savings Bank (the "Howard") for a stay pending its appeal from the November 10, 1994 order of this court. The November 10, 1994 order authorized debtors to complete a sewer hookup for Knob Hill Victorian Estates ("Knob Hill") apartment complex and vacated a consent order dated July 15, 1994 (the "November 10, 1994 order"). FFB appealed the November 10, 1994 order on the grounds that the order impermissibly granted debtor, Knob Hill, the authority to fund the hookup with rents which were either the property or cash collateral of FFB. Debtor objected to the motion and this court held a hearing on November 23, 1994. At that hearing, this court issued a bench order and opinion denying FFB's motion. This opinion is a memorialization of the court's ruling at the November 23, 1994 hearing.

This court has jurisdiction over the matter pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(b)(1). This is a core matter under §§ 157(b)(2)(A), (M), and (O).

### STATEMENT OF FACTS

The debtors, whose cases have been administratively consolidated, consist of Lorraine Mocco and Peter Mocco, husband and wife, as well as Knob Hill, Village Townhouse Estates, Inc. ("VTE"), and Liberty Harbor North, Inc. Peter Mocco is a real estate developer and the sole shareholder of the three corporate debtors. Knob Hill owns 87 rental apartments in the Bergenwood Commons, a 126 unit condominium complex located in North Bergen, New Jersey. Debtor intends to convert the units from rental to "for sale" condominiums and sell them.

FFB, a secured creditor, obtained a $4,486,641.34 foreclosure judgment on April 6, 1994 and asserts this lien against 37 Knob

Hill units. The lien arises from a $4.1 million loan from FFB's predecessor The Howard Savings Bank to Knob Hill on November 16, 1987 secured by a mortgage covering the 37 units and an assignment of leases and rents. A restructuring and security agreement was entered into among The Howard, Knob Hill and VTE on September 15, 1991 which continued the 1987 assignment of leases and made it a part thereof. On June 18, 1993, FFB had a rent receiver (New Vistas Corporation) appointed by a state court judge because Knob Hill was not remitting rents. New Vistas has since managed the property, collected rents, and paid expenses for the 37 units. The remaining 50 units are subject to a lien of a partnership known as Coolidge Knob Hill Equities, L.P. ("Coolidge"). In July 1993 Coolidge obtained a state court appointment of Delev Corp. as rent receiver for the 50 units subject to its lien.

The Knob Hill units are not presently marketable because there have been no certificates of occupancy issued since a sewer hook-up has not yet been completed. The Knob Hill complex was constructed in 1988 and is occupied even though the sewage collection system does not convey the sewer to the regional sewer treatment plant. Thus no sewage is treated and raw fecal coliform has continued to flow into the storm drains of North Bergen.[1]

On June 9, 1988 New Jersey Department of Environmental Protection ("NJDEP") discovered that Knob Hill had constructed sewer extensions without having obtained a NJDEP treatment works approval and directed Knob Hill to submit an application. Knob Hill submitted its application for a treatment works approval on March 29, 1989. However, on April 5, 1991 the sewer problem had still not been remedied and NJDEP fined Knob Hill $688,830 for violating the New Jersey Water Pollution Control Act. N.J.S.A. 58:10A–1 et seq.

Peter Mocco has worked with the North Bergen Municipal Utilities Authority ("MUA"), and they have now agreed on a solution which calls for the construction of a new sewer pipe to convey the Bergenwood Commons' sewage from north to south along Smith Avenue. The agreement also provides for payment of $181,000 hook-up fees to MUA. Finally, on February 3, 1994 NJDEP and MUA approved Mocco's CP-1 Application for construction of the sewer improvement. During the time period that the rent receivers have been in charge of managing the Knob Hill property (since June and July 1993), they have done nothing to remedy the sewer situation.

On March 30, 1994 Peter and Lorraine Mocco filed separate voluntary petitions for relief under Chapter 11 with this court. On April 14, 1994 Knob Hill, VTE and Liberty Harbor North filed separate Chapter 11 petitions. On May 3, 1994, FFB moved to lift the stay and excuse the rent receiver from compliance with 11 U.S.C. § 543. The court carried the lift stay motion to confirmation but excused the receivers from compliance with section 543. Thus, while the receivers continue to manage the property, the sewer problem has still not been remedied.

On May 24, 1994, FFB and Coolidge moved for an order authorizing the receivers, New Vistas and Delev Corp. (collectively the "rent receivers") to complete the sewer hook-up. This matter was subsequently resolved by consent order dated July 15, 1994, executed by counsel for FFB, Coolidge, and debtors and approved by this court. Pursuant to the July 15, 1994 consent order the rent receivers were required to construct the sewer connection in accordance with the February 3, 1994 CP-1 TWA permit, retain Asad Diabes & Sons general contractors, and complete the connection within three months of issuance of the consent order. The consent order specifically directed the rent receivers to pay sewer connection fees of MUA, the certificate of occupancy fees, and payments to the contractor out of the rents.

Diabes did not inspect the property until August 9, 1994 and advised that he wanted to change the specifications in the CP-1 permit

---

1. This sewage problem also faces 20% of the entire town of North Bergen, and represents a continuing municipal problem which has engaged the attention of the Township of North Bergen, the Municipal Utilities Authority, and the State of New Jersey, Department of Environmental Protection.

from a gravity feed system, the preferred system by NJDEP, to a pump system for an additional $10,000. FFB approved the $10,000 increase. The debtors, however, objected because the modification was not in accordance with the CP–1 and a modification of the CP–1 permit would take several months. The parties entered further negotiations with Diabes to perform the sewer connection in accordance with the CP–1. The negotiations proved fruitless and in early October, after Diabes was given an ultimatum to comply with the permit, Diabes abandoned the job with no work having been done. The receivers found a second contractor who agreed to do the work in accordance with the CP–1 permit but who demanded $165,000 to do the job.

Frustrated, Debtor moved on October 26, 1994 to vacate the July 15, 1994 consent order and permit Knob Hill and Peter Mocco to complete the hook-up for $84,000 plus rock excavation. FFB filed an objection to the motion which did not oppose vacating the consent order but objected to the use of the rents to pay for the fees. This court heard the motion to vacate July 15, 1994 consent order on November 2 and November 10, and by telephone conference on November 7, 1994. At these hearings, however, counsel for FFB did not object to the relief provided.

On November 10, 1994 this court vacated the July 15, 1994 consent order and authorized Knob Hill and Peter Mocco to complete the sewer hookup in accordance with the CP–1 permit for $84,000 plus excavation blasting costs. The court also directed the rent receivers to disburse such funds as are necessary to meet hookup fees and expenses. The court finally directed that work on the project be commenced by November 14, 1994 and completed by December 18, 1994.

On November 14, 1994 this court held another telephone conference with the parties regarding a dispute between FFB and debtor over delivery of checks. FFB also wanted language added to the November 10, 1994 order to protect the receivers. At this telephonic hearing, FFB did not raise any objections about the merits of the November 10, 1994 order, did not state it was appealing the November 10, 1994 order, and did not ask for a stay pending appeal. This court obliged and added the requested language, and the checks were delivered to the Township of North Bergen and MUA, but not negotiated. On November 21, 1994, after an oral application for a stay pending appeal and temporary restraints was not entertained by this court, FFB filed a motion for an order granting a stay pending appeal from the November 10, 1994 order.

FFB contends that it has met the criteria for a stay pending appeal because (i) it has been irreparably harmed since debtor is using its property with no assurance that it will be returned; (ii) the public interest lies in its favor since the sewer problem has continued unabated since 1988; (iii) no other parties would be substantially harmed; and (iv) FFB is likely to succeed on the merits because the bankruptcy court improperly permitted debtor to use rents to complete the sewer hookup which are property of FFB and not the estate; or alternatively, the bankruptcy court improperly permitted debtor to use FFB's cash collateral.

Debtors counter that FFB cannot meet the standards for a stay pending appeal because it is unlikely to succeed on the merits since the rents are property of the estate and are properly being used as cash collateral. Debtor also argues that FFB should be judicially estopped from arguing that rents cannot be used for the sewer hookup because FFB consented to the use of those identical funds in July 1994 through November 1994. In addition, debtor argues that public policy does not lie in FFB's favor because implementation of the November 10, 1994 order will remedy a violation of the New Jersey Water Pollution Control Act.

### DISCUSSION

Federal Rule of Bankruptcy Procedure ("FRBP") 8005 permits a bankruptcy judge to stay a judgment pending appeal "on such terms as will protect the rights of all parties in interest." FRBP 8005. The balancing factors for a stay pending appeal are identical to those controlling a preliminary injunction. *In re X–Cel Constructors of Delaware, Inc.*, 76 B.R. 969, 970 (D.N.J.1987). Those factors are:

(1) likelihood that the party seeking the stay will prevail on the merits of the appeal; (2) irreparable injury to the moving party unless the stay is granted; (3) no substantial harm to the other interested persons; and (4) no harm to the public interest.

*Id.* (citing *West Indian Co., Ltd. v. Government of Virgin Islands,* 812 F.2d 134 (3d Cir.1987)). In balancing the above factors this court finds that the stay should not be granted. Each of the four factors will be discussed separately below.

### 1. *Likelihood of Success on the Merits*

FFB argues that it will succeed on the merits because the November 10, 1994 Order improperly permits debtor to use rents which are FFB's property by virtue of an assignment of rents. FFB contends that this is a violation of the takings clause of the Constitution. FFB argues in the alternative that the use of rents to complete the sewer hookup is an improper use of its cash collateral without adequate protection.[2]

■ As a preliminary matter, this court agrees with debtor that FFB should be judicially estopped from arguing that rents are not property of the estate. FFB itself moved for authorization to use rents for completion of the sewer hook-up by its rent receiver. FFB forcefully argued that it was crucial to complete the sewer connection to remedy a public health threat and agreed to the use of its cash collateral to fund the work. On at least seven occasions FFB participated in hearings before this court and did not contest the completion of the sewer connection. Furthermore, the purpose of FFB's current objection is improper. There has been no justification set forth by FFB that is legally or factually cognizable by this Court indicating why the rent receivers' contractor, Diabes, should have been allowed to go forward to complete the project and debt-

or should not. This court finds that FFB's current objection is a result of longstanding disputes. It is arbitrary at best and, at worst, an improper discrimination against the debtor. Despite the existence of cause to apply judicial estoppel, this court will address the merits of the likelihood of success on the merits.

### A. Assignment of Rents and Property of the Estate

The effect of an assignment of rents in a bankruptcy case is a developing area of the law and has been called "the crucible of bankruptcy." Bonnie K. Donahue & W. David Edwards, *The Treatment of Assignments of Rents in Bankruptcy: Emerging Issues Relating to Perfection, Cash Collateral, and Plan Confirmation,* 48 Bus.Law. 633 (Feb. 1993). An issue that is in conflict in the Third Circuit is whether assigned rents constitute property of the estate subject to use by debtor as cash collateral, or whether the assigned rents are property of the mortgagee/creditor not subject to use by the debtor.

Cash collateral is defined as "cash ... or other cash equivalents ... in which the estate and an entity other than the estate have an interest and includes ... rents, or profits of property subject to a security interest as provided in section 552(b) of this title ..." 11 U.S.C. § 363(a). Under section 363(c), the debtor may use cash collateral in certain limited circumstances. A threshold issue is whether the rents are property of the estate. Code section 541(a) provides that the estate is comprised of all "... legal or equitable interests of the debtor in property as of the commencement of the case ..." 11 U.S.C. § 541(a). In this case the court is specifically asked to determine whether debtor had any interests in assigned rents following the appointment of a rent receiver due to debtor's default on its mortgage. FFB asserts

2. FFB also argued that the November 10, 1994 Order improperly commingled the assets of two distinct debtors, Knob Hill and VTE by directing the receiver to issue checks in excess of the funds on deposit in the Knob Hill account (the "VTE Issue"). FFB contended that the receiver would have to use VTE funds, thereby improperly substantively consolidating the two entities without a

hearing. At the November 23, 1994 hearing debtor's counsel advised the court that no funds would be taken from VTE's account. This statement was not controverted at the hearing, no evidence to the contrary was presented, and FFB did not pursue the VTE argument. Thus this court finds that the VTE Issue is moot since no VTE funds were used.

that debtor's interests have been terminated and FFB is the owner of the rents.

■ Property interests of a debtor/mortgagor and creditor/mortgagee are governed by state law to "ensure that the mortgagee is afforded in federal bankruptcy court the same protection he would have under state law if no bankruptcy had ensued." *Butner v. United States,* 440 U.S. 48, 56, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979); *see also Commerce Bank v. Mountain View Village, Inc.,* 5 F.3d 34, 37 (3d Cir.1993).

In determining the debtor's property interests in the rents under New Jersey law, the court must address two factors. First, whether the language of the assignment instrument created an absolute assignment or merely a lien on the rents; and second, whether a mortgagor retains any interest in rents following a default but prior to delivery of a sheriff's deed, irrespective of the language of the assignment.[3]

### Language of the Assignment

■ New Jersey law distinguishes between a pledge of rents and an assignment. *In re Stanton v. Metropolitan Lumber Co.,* 107 N.J.Eq. 345, 348, 152 A. 653, 655 (Ch. 1930). This distinction is important because a pledge of rents creates **a lien** which does not entitle the mortgagee to the rents until possession. However, an absolute assignment **conveys title** to the rents to the mortgagee and permits collection immediately upon default. *Id.* It is the language of the assignment which governs whether a pledge or assignment has been created. *See Matter of Glen Properties,* 168 B.R. 537, 539 (D.N.J. 1993) ("the question of each party's rights in this situation, rests quite simply upon the language of the assignments in question.") *Id.* at 539; *see also In re Donato,* 170 B.R. 247, 252 (Bankr.D.N.J.1994); *First Fidelity Bank, N.A. v. Jason Realty, L.P.,* Civ. No. 94–2857, Slip. Op. at 6 (D.N.J. Oct. 5, 1994) (not for publication).

■ In determining what language creates an assignment instead of a mere pledge. *In re Winslow Center Assocs.,* 50 B.R. 679, 681 (Bankr.E.D.Pa.1985), interpreting New Jersey law, found the following:

> The distinction between an assignment and a pledge of security is based on the precise wording of the pertinent mortgage clause.... If the pertinent clause gives the mortgagee a vested interest in rents at the time of creation of the mortgage, the clause is construed as an assignment. Who has actual or constructive possession of the rents is irrelevant. The applicable mortgage provision is deemed a pledge security if the mortgagee's interest in the rents does not vest until the occurrence of some precipitating event such as default under the mortgage. *Id.*

The court in *In re Donato* applied a stricter standard that "[a]bsent unequivocal and unambiguous language reflecting that the parties intended to transfer title to the rents, such assignments will be construed as granting the assignee merely a security interest." 170 B.R. at 253. Courts in other jurisdictions look to whether the assignment stated that it was made "for additional security." *See In re Grant Assocs. (Travelers Indemnity Co. v. Grant Assocs.),* No. M–47(RJW), 1991 LEXIS 1245, 1991 WL 21228 (S.D.N.Y. 1991) (citing *Matter of Nevada, Inc.,* 641 F.2d 737, 739 (9th Cir.1981)) (such qualifying language indicates that an absolute assignment was not intended).

The Assignment of Leases and Rents from Knob Hill to FFB provided the following:

> *Assignor for good and valuable consideration, receipt whereof is hereby acknowledged, hereby grants, transfers and assigns to the Assignee* the entire lessor's interest in and to those certain Leases (the "Leases") ...

\* \* \* \* \* \*

3. In this case it is undisputed that the mortgagor perfected its lien by recording the assignment of rents, and also enforced its security interest by taking possession of the rents all prior to the commencement of the case. Thus there is no issue in this case, as there was in *Midlantic National Bank v. Sourlis,* whether the mortgagee's interest in the rents was perfected pre-peti-

tion or enforced pre-petition. 141 B.R. 826, 832 (D.N.J.1991). *Sourlis* chose between two conflicting lines of New Jersey cases and held that it is the pre-petition *perfection* of the security interest that permits the mortgagee's lien to survive the filing of a petition, by virtue of 11 U.S.C. § 552(b). *Id.*

*THIS ASSIGNMENT is made for the purpose of securing:* ... the payment of ... a certain Note in the principal amount of Four Million One Hundred Thousand ($4,100,000) Dollars made by Assignor.

\* \* \* \* \* \*

So long as there shall exist no default by the Assignor ..., the Assignor shall have the revocable privilege to collect at the time of, but not prior to, the date provided for the payment thereof, all rent, income and profits arising under said Leases ...

\* \* \* \* \* \*

Upon or at any time after default in the payment of the principal sum, ... the Assignee may at its option ... take possession of the premises described in said Leases and/or Mortgage and have, hold, manage, lease and operate the same on such terms and for such period of time as the Assignee may deem proper and either with or without taking possession of said premises in its own name, demand, sue for or otherwise collect and receive all rents ...

\* \* \* \* \* \*

*Upon payment in full of the principal sum, interest and indebtedness secured hereby and by said Note and Mortgage this Assignment shall become void and of no effect ...*

This court finds that the assignment was not absolute and was intended as a pledge to secure payment of an underlying debt[4]. While there is some language to the contrary (the assignment stated that it "hereby grants, transfers and assigns to the Assignee"), the overall effect of the document is to create a pledge for security because of addi-

tional language indicating a pledge.[5] For instance, the mortgagee has no rights to the rents absent default on the mortgage. Furthermore, the assignment states that its purpose is to "secure" the repayment of the underlying note. In addition, the assignment becomes void upon repayment of the debt. Thus this court finds that the language of the assignment did not transfer title but created a pledge for security. The language of the assignment instrument as a whole indicates that the transaction is clearly structured as one to secure repayment of a loan.

**Mortgagor's Interest in the Rents**

■ FFB argues that irrespective of the language of the assignment, the rents are not property of the estate because FFB took possession of the rents which terminates debtor's interest. *Spiotta v. Nat'l Grocery Co.,* 11 N.J.Misc. 739, 168 A. 159 (Hud.Co. 1933); *Stewart v. Fairchild–Baldwin Co.,* 91 N.J.Eq. 86, 89, 108 A. 301, 302 (Ch.1919); *Stanton v. Metropolitan Lumber Co.,* 107 N.J.Eq. 345, 152 A. 653 (Ch.1930). Absent any interest of debtor in the rents, those rents are not property of the estate under 11 U.S.C. § 541. This court finds that irrespective of the language of the assignment or enforcement by a mortgagee taking possession, and irrespective of whether the transaction is a pledge or an absolute assignment, the debtor retains a sufficient interest in the rents to make them property of the estate.

A starting point is the lead Third Circuit case, *Commerce Bank v. Mountain View Village, Inc.,* 5 F.3d 34 (3d Cir.1993). In *Mountain View,* a chapter 11 debtor executed assignment of rents in connection with a mortgage. After default, but prior to filing of the bankruptcy petition, the bank took possession of the premises, collected the rents, and

---

4. FFB urges this court to follow *In re Jason Realty, L.P.,* which held that the same language in the assignment of rents created an absolute assignment, and that the rents were not property of the estate. Slip. Op. at 8 (D.N.J.1994). FFB argues that the assignment in *Jason Realty* is identical to the assignment of rents in this case because both assignments stem from old Howard Savings Bank loans. However, this court, is not bound by *Jason,* an unpublished opinion. Furthermore, this court finds that the language of the assignment of rents compels a different result.

5. There is some case law in New Jersey which suggests that a conditional assignment is converted to an absolute assignment upon default and becomes immediately effective, and enforceable. *Stanton v. Metropolitan Lumber Co.,* 107 N.J.Eq. 345, 348, 152 A. 653, 54–55 (Ch.1930). However, as will be discussed below, irrespective of whether the assignment was absolute, conditional or merely a pledge, the debtor still retains an interest in the rents sufficient to bring them within the parameters of "property of the estate" as defined in 11 U.S.C. § 541.

obtained a foreclosure judgment. *Id.* at 35. The Third Circuit first examined the development of mortgages in the United States. The panel noted that there are two different types of approaches to mortgages adopted by the various states, a "lien theory" and a "title theory." In describing a "lien theory" approach the Third Circuit pointed out that "[d]evelopment of the equity of redemption in the chancery courts led to growth of this lien theory so that, although the creditor mortgagee had legal title, the mortgagor remained the actual owner until debarred by default or judicial decree. In time, the only method by which the creditor could terminate the equity of redemption was by foreclosure." *Mountain View,* 5 F.3d at 37. The court concluded, that unlike a lien theory state, Pennsylvania follows the title theory where the debtor transfers the property to the creditor in fee simple provided that the creditor reconveys the property back to debtor upon repayment of the loan.

The Third Circuit turned to the assignment of rents and found that "[u]nder Pennsylvania law, it is clear that the banks were legally entitled to take the steps they did when the debtor was unable to cure the default. Therefore, the rents are not property of the debtor's estate and are not available for use in a plan of reorganization." *Id.* at 38 (citing Laurence D. Cherkis, Collier Real Estate Transactions and the Bankruptcy Code ¶ 2.03[1], at 2–69 (1992)). The court noted that it was not determining the issue whether "banks would prevail even if the mortgages were considered to be security interests rather than transfers of title." *Id.* at 39.

▮ Since New Jersey is a "lien theory" state, *Chase Manhattan Bank v. Josephson,*

135 N.J. 209, 638 A.2d 1301 (1993)[6], and mortgages in New Jersey are considered to be security interests rather than transfers of title, *Mountain View* does not dispose of this matter. *Mountain View* concluded that in a "title theory" state, a mortgagor retained no interest in the rents because the property was conveyed to the mortgagee in fee simple pending repayment of the loan, at which point title is reconveyed. Thus it is imperative to determine what interest, if any, a mortgagor retains in assigned rents under New Jersey law.

*In re Princeton Overlook Joint Venture,* examined the type of interest a debtor retained under New Jersey law where there is an absolute assignment of rents. 143 B.R. 625, 633 (Bankr.D.N.J.1992). This court in *Princeton Overlook* concluded that the mortgagor retained a "collection interest" in the rents; thus the rents are property of the estate under 11 U.S.C. § 541. *Id. Princeton Overlook* explained that the debtor was entitled to the profits in the rents after satisfaction of the mortgage debt and payment of expenses. *Id.* The *Princeton Overlook* court followed the approach of *Travelers Indemnity Company v. Grant Assocs.,* No. M–47 (S.D.N.Y. filed February 5, 1991).[7]

*Grant Associates* fully explored the nature of a debtor's collection interest in assigned rents in both lien and title theory states, and concluded that "the finding that the assignment was absolute does not necessarily compel the conclusion, as assumed by both parties, that the lendee thereby holds more than a security interest in the rents or that Debtor retains no interest whatsoever in the rents." *Id.* 1991 WL 21228 at *4. The court found that most cases which concluded that the rents were not property of the estate,

---

**6.** *In re Jason Realty* states that the treatment of mortgages does not control the legal treatment of assignment of rents. Slip Op. at 6. This court finds that where an assignment of rents is given as security for a mortgage and the two documents are intertwined by their terms (i.e. mortgagee's right to collect rents does not arise until default on the mortgage, assignment is void upon repayment of loan), the court must consider the applicable treatment of mortgages. This view is fully supported by the New Jersey common law, *see infra* p. 344–45, in which the assignee's rights to assigned rents is contingent on the rights of various parties under mortgages. This view is

also supported by the Third Circuit in *Mountain View,* which fully analyzed the treatment of mortgages, and based its analysis on the applicable theory of mortgages in Pennsylvania. (*Mountain View* involved an assignment of rents that was contained in a separate document).

**7.** *Grant Assoc.* applied Georgia law. Georgia is a hybrid "lien theory" and "title theory" state. No. M–47, 1991 WL 21228 at *3. *Grant Assoc.* held that the debtor retained an equitable collection interest under *both* a "lien" and "title" theory. *Id.*

nevertheless acknowledged that the debtor did retain some kind of interest in the rents. *Id.* (citing *In re Galvin*, 120 B.R. 767 (Bankr. D.Vt.1990) (Vermont law); *Matter of P.M.G. Properties*, 55 B.R. 864 (Bankr.E.D.Mich. 1985) (Michigan law); *In re Fry Assoc.*, 64 B.R. 808 (Bankr.W.D.Texas 1986) (Texas law)).

The collection interest has been characterized as a right to an accounting and liability to debtor until expiration of period of redemption. *Grant Assocs.*, No. M–47, 1991 WL 21228 at *4. The collection interest has also been characterized as the debtor's right to be discharged from the mortgage debt or paid pro tanto. *Matter of P.M.G.*, 55 B.R. 864; *In re Fry*, 64 B.R. 808. Whatever the nomenclature, the courts seem to be struggling with the concept that after the underlying loan is paid off in full, including interest, the debtor is again entitled to the rents. *See also* Donahue & Edwards, *The Treatment of Assignments of Rents in Bankruptcy*, 48 Bus.Law. at 650 n. 126 ("whether it accurately can be stated that the debtor's interest in rents is cut off entirely is problematic. If the debt is satisfied entirely from the rents, the debtor should be entitled to rents accruing after satisfaction of the debt."). The issue is troubling, because the conclusion that debtor's interest in the rents has been fully extinguished upon possession by the bank is a fiction and ignores the reality of the mortgagor/mortgagee relationship where the borrower pledges property to provide the lender with security that its loan will be repaid. That the rents have only been pledged as additional security is evidenced by the fact that mortgagee is not entitled to the rents if debtor repays the loan. As the Supreme Court of the State of New Jersey noted, "a mortgagor's equity of redemption" developed where "equity intervened to recognize *the true nature of the transaction as one of security, not conveyance.*" *Carteret Savings and Loan Ass'n, F.A. v. Davis*, 105 N.J. 344, 347, 521 A.2d 831, 833 (1987).

■■■■ Under New Jersey law a debtor retains a collection interest in the rents that is grounded in the equity of redemption. "The rights of a mortgagee in possession are to collect the rents and profits; his responsibilities include a liability to account for those rents and profits on redemption." *Merchants' & Traders' Realty Co. v. Stern*, 101 N.J.Eq. 629, 633, 138 A. 697, 699 (Ch.1927); *Stewart v. Fairchild–Baldwin*, 91 N.J.Eq. 86, 89, 108 A. 301, 302 (Ch.1919).[8]

The equity of redemption is vested at the execution of the mortgage and continues until delivery of sheriff's deed.[9] A mortgagor is entitled to have the rents applied to pay down the debts after mortgagee's allowable expenses are deducted. *Eisen v. Kostakos*, 116 N.J.Super. 358, 369–70, 282 A.2d 421, 426–27 (App.Div.1971) (citing 4 American Law of Property (1952); Osborne on Mortgages § 165 at 286–87 (2d ed. 1970); and 2 Glenn on Mortgages § 206 at 1033, § 224 at 1080, 1082 (1943)). To determine what income is to be applied to the mortgage debt, the mortgagee must account to mortgagor as to what expenses were paid with the rents. *Id.* Upon a bill to redeem, a mortgagor may demand an accounting from a mortgagee in possession of rents. The accounting, which arises only in a redemption action or foreclosure, is to be made "with equitable theory

---

**8.** Debtor relies on *Stewart v. Fairchild–Baldwin Co.* for the proposition that the mortgagee puts an end to the rights of a mortgagor in rents upon taking possession, subject to redemption by the mortgagor. 91 N.J.Eq. at 108, 108 A. at 302. (*Stewart* dealt with the rights of a mortgagee to rents when there was no assignment—just by virtue of the mortgage). FFB's reliance on *Stewart* is misplaced for two reasons. First, the proposition that a mortgagee puts an end to the rights of a mortgagor upon taking possession conflicts with *Chase Manhattan Bank v. Josephson*, which held that a mortgagee does not obtain any ownership interests until after foreclosure sale. 135 N.J. at 218, 638 A.2d at 1305. Second, *Stewart* stated that mortgagee's interest in the rents was subject to mortgagor's right of redemption.

Thus even under *Stewart* the mortgagor retained an interest in the rents.

**9.** The right of redemption arises by statute N.J.S.A. 2A:50–16 et seq., by rule 4:65–5,6 and by equity. The statutory right of redemption permits the mortgagor to pay off the mortgage debt in full for at least ten days after sheriff's sale and, vacate the foreclosure and reclaim the property. Rules 4:65–5,6. If mortgagor does not execute that right then sheriff may deliver the deed to purchaser. *See Hardyston National Bank v. Tartamella*, 56 N.J. 508, 267 A.2d 495 (1970); *See also* Pressler, *New Jersey Court Rules*, Comment R. 4:65–5 (1995 ed.).

and practice and ... is in the nature of an equitable set-off when the debt is being paid." *Id.* After redemption, mortgagor is entitled to the surplus. *Id.*

■ In addition to providing the debtor with the right to an accounting and discharge, the equity of redemption prevents a mortgagor from obtaining an ownership interest in the underlying mortgaged property until the mortgagee purchases the property at foreclosure sale and the redemption period has expired. *Chase Manhattan Bank v. Josephson,* 135 N.J. at 218, 638 A.2d 1301, 1305. Therefore, the mortgagee must terminate debtor's equity of redemption by foreclosure sale (and the passage of the appropriate statutory period) in order to extinguish debtor's ownership interest in the property.

■ This equity of redemption is a very important right which is retained by the debtor. The New Jersey Supreme Court explains that "the 'equity of redemption', [is] a valuable right that came to be seen as an equitable estate in land that was alienable, devisable and descendible." *Carteret Savings and Loan Ass'n, F.A. v. Davis,* 105 N.J. 344, 347, 521 A.2d 831, 833 (1987). "So important is this right that the New Jersey courts have held that an agreement made at inception of the transaction to void the right is void as against public policy." *In re Coleman (Coleman v. Citicorp Mortgage, Inc.),* 82 B.R. 15, 18 (Bankr.D.N.J.1988). Thus regardless of whether the transaction is a pledge of rents, or an absolute assignment, and regardless of whether the mortgagee has taken possession of the rents, the debtor retains an interest in those rents.

Having determined that the mortgagor retains an interest in assigned rents after the mortgagee takes possession the next question is why that interest should not be included within the broad definition of property of the estate under 11 U.S.C. § 541.

Two courts in this district concluded that the interest retained by the debtor was only

a future interest and therefore was not property of the estate. *In re Glen Properties,* 168 B.R. at 541; *Jason Realty,* Slip. op. at 8. However, those decisions did not consider the debtor's right to an accounting, redemption or analyze the issue in the context of 11 U.S.C. § 541. *Glen Properties* simply concluded that under the terms of the assignment the debtor had a "license" to collect rents and "when that license terminated due to [debtor's] default, [debtor] simply had no interest left. Its only interest in the rents will accrue at some future date on which the underlying indebtedness will be paid in full and the Assignments will become 'void and of no effect.' [Debtor's] interest in the rents therefore, is a contingent future interest." 168 B.R. at 541. *Jason Realty* adopted the approach of *Glen Properties.* Slip. op. at 8. This court disagrees and finds that debtor's interest in the rents is property of the estate under 11 U.S.C. § 541.[10]

The Second Circuit held that an owner of the equity of redemption retains an equitable interest in the underlying property within the meaning of 11 U.S.C. § 541(a). *In re Brown (Brown v. Dellinger),* 734 F.2d 119 (2d Cir.1984). Judge Kearse noted that, "the phrase 'all legal or equitable interests of the debtor in property' has been given the broadest possible interpretation." *Id.* at 123. The court further explained that the "'legal or equitable interests' of the debtor have been held to encompass an interest that is strictly contingent." *Id.* (citations omitted). The Second Circuit also noted that the legislative history of the Bankruptcy Code supported the broad interpretation of "equitable interest", and specifically approved the holding of *Segal v. Rochelle,* 382 U.S. 375, 379, 381, 86 S.Ct. 511, 514–15, 516, 15 L.Ed.2d 428 (1966), that a debtor has a cognizable interest in contingent claims for tax refunds. *Id.* (citations omitted).

*Brown v. Dellinger,* involved a surplus after foreclosure sale of debtor's home. The

---

10. 11 U.S.C. § 541(a) provides:
(a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:

(1) ... all legal or equitable interest of the debtor in property as of the commencement of the case.

court found that title to surplus funds after foreclosure passed to the County Commissioner of Finance for the benefit of interested parties. A judgment creditor claimed that the surplus funds were not property of the estate. Debtor claimed that she retained an equitable interest in those proceeds within the meaning of "property of the estate" under 11 U.S.C. § 541. The Second Circuit agreed and specifically found that a debtor "as the owner of the equity of redemption ... at the time the bankruptcy estate was created ... had a clear contingent interest in the entire $7,543.38 surplus. The properly broad reading of § 541 thus requires that we recognize that this interest became part of the bankruptcy estate." Id. at 124. This was true even though there were competing interests in that surplus (i.e. a judgment creditor). Similarly, Knob Hill, as the owner of the equity of redemption, has a clear contingent interest in the rents which became property of the estate on the filing of the petition.

■■■■ It is clear from the above analysis that the debtor's right of redemption becomes property of the estate if the period of redemption has not expired at the time the petition is filed. See 4 Collier on Bankruptcy, § 541.07(8) (15th Ed.1980) (citations omitted). However, it is also true that the underlying property itself (i.e. the mortgaged real property, the surplus, or the rents) also becomes "property of the estate" because as explained in Brown v. Dellinger supra the debtor retains a sufficient equitable interest in that property.

The Ninth Circuit also concluded that the equity of redemption brings the property within the estate. However, the Ninth Circuit concluded that debtor retained more than a contingent future interest in the mortgaged property, but rather a presently vested legal and equitable interest. Matter of Grosso (Hamblen v. Federal Savings and Loan Insurance Corp.), 457 F.2d 168, 171 (9th Cir.1972). The Grosso court explained that "under the law of foreclosure up to the time of the sale of the property, the mortga-

gor, holds both the legal and equitable titles. When the sale is made, the equitable title passes to the purchaser subject to defeasance by redemption within the statutory period ... If there is no redemption, the sheriff's deed completes the legal title of the purchaser ... If a redemptioner appear, the purchaser loses all title, legal and equitable, in the property, which passes to the former." Id.[11] The Grosso court found that under the equity of redemption, the debtor retained more than the opportunity to acquire a new asset. Rather, "the legal title he possesses is the undivested remnant of his mortgagor's interest." Id. at 172. In redeeming the property, the trustee would be preserving an old asset rather than acquiring a new one. This analysis led the Ninth Circuit to conclude that "[t]here can be no question that the title retained by the debtor throughout the period of redemption constitutes property in the hands of the trustee as to which the chapter X court, under § 111 has exclusive jurisdiction." Id. Although Grosso was a pre-code case, its reasoning still stands. As explained above, the legislative history of the Code intended an expansive interpretation of "property of the estate." In addition, the Code broadened the jurisdiction of bankruptcy courts over property to a greater extent than that which was available under the prior Bankruptcy Act. See United States v. Whiting Pools, Inc., 462 U.S. 198, 206 n. 13, 103 S.Ct. 2309, 2314 n. 13, 76 L.Ed.2d 515 (1983). Furthermore, the state property law analysis is unaffected by changes in the bankruptcy code.

United States v. Whiting Pools, Inc., 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983) lends additional support that the debtor retained a sufficient interest in the rents due to the equity of redemption, to bring them within the definition of property of the estate under section 541. Whiting Pools involved the seizure of equipment by the Internal Revenue Service ("IRS") to satisfy a tax lien. In that context, the Supreme Court examined when a debtor's interest in property was extinguished and when title to proper-

---

11. Matter of Grosso involved an Arizona redemption statute A.R.S. §§ 33–721 et seq. and §§ 12–1621, et seq., that, similar to the statute in New Jersey, permitted a mortgagor to redeem property within a specified time after foreclosure sale.

ty was transferred to the secured creditor. The Supreme Court found that the IRS did not have the badges of ownership of property because at no point did the "service's interest in the property exceed the value of the lien." *Id.* at 211, 103 S.Ct. at 2317 (citations omitted). Furthermore, the IRS was "obligated to return to the debtor any surplus from a sale." *Id.* The Supreme Court was further persuaded by the fact that ownership of the property was not transferred until a bona fide tax sale occurred. *Id.* The Supreme Court expressed the same concerns as expressed above, that where the secured creditor does not have any rights to the property after repayment of the underlying debt, the debtor's interest in the property has not been extinguished. *See supra* p. 343–44.

The same analysis applies to the debtor's interest in the pledged rents. The bank's interest in the rents does not exceed the value of the lien because repayment of the loan nullifies the assignment. After redemption, the debtor is once again entitled to the rents. Furthermore, the equity of redemption entitles the debtor to any surplus after foreclosure sale.

This result does not conflict with the Third Circuit's interpretation of state law in *Matter of Roach*, 824 F.2d 1370 (3d Cir.1987). *Roach* held that upon entry of final judgment of foreclosure the "mortgage merges into the final judgment and the mortgage contract is extinguished." *Id.* at 1377. The *Roach* court thus concluded that a chapter 13 debtor could not cure the mortgage under 11 U.S.C. § 1322(b) because there was nothing left to cure. *Id.* However, the Third Circuit was careful to distinguish between cure of defaulted obligations by a debtor under § 1322 and "the property interests of the debtor in

property pledged to secure those obligations." *Id.* at 1372 n. 1. The fact that a mortgage and the foreclosure judgment merge at entry of the judgment does not change or eliminate the debtor's equitable right of redemption. The equity of redemption requires nothing less than payment in full of the foreclosure judgment (not cure) and is thus completely harmonious with *Roach.*[12]

This result also does not conflict with the mandate of *Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979) that the debtor receive the same treatment in bankruptcy court that it would receive in state court. Under state law the debtor retains an equitable interest in rents and mortgaged property after default but prior to delivery of sheriff's deed. To exercise that interest debtor must fully satisfy the mortgagee's debt to redeem the property. In bankruptcy, debtor still retains that interest and in order to redeem the property debtor must still fully satisfy the debt (subject to cram-down provisions of the Code which are not at issue here). The debtor is not acquiring a greater or different "property interest" in bankruptcy. However, once property is defined as property of the estate, then the Bankruptcy Code properly controls the disposition of that property, such as the use of cash collateral under 11 U.S.C. § 363(c). Because this court finds that the assigned rents are property of the estate, we do not reach the issue of the takings clause of the Constitution.

### B. Cash Collateral for Sewer Connection

FFB argues in the alternative that this court impermissibly permitted Knob Hill to

12. *Roach* held that the language of § 1322(b) did not favor foreclosure sale over foreclosure judgment as a cutoff point for cure. *Roach* then chose foreclosure judgment as a cutoff point based upon state law. *Id.* at 1379. Congress has now spoken, and *Roach* has been explicitly overruled by the Bankruptcy Reform Act of 1994 which permits cure of a mortgage up to foreclosure sale. Congress held that the result in *Roach* was overruled because it conflicted with the fresh start policy of bankruptcy. *See* Bankruptcy Reform Act of 1994, § 301. *See also* Section by Section Description, p. 33 Cong.Rec. H10, 764 (daily ed. October 4, 1994) (Statement of Rep. Brooks).

It should also be noted that the predecessor bill to the Bankruptcy Reform Act of 1994 sought to clarify that assigned rents were to be treated as cash collateral, irrespective of whether the creditor had commenced enforcement of the lien, or whether the assignment instrument treated the rents as property of creditor with debtor collecting the rents "in trust" for the creditor/mortgagee. *See* S.1985, § 203 (1992). That provision, however, was omitted from the final statute, without explanation, as were most other controversial provisions.

use its cash collateral under 11 U.S.C. § 363(c) because it has not been provided with adequate protection that the funds will be returned. This court finds that the cash collateral is properly being used to fund the sewer hook-up and that FFB has been provided with adequate protection.

 Assigned rents constitute cash collateral under 11 U.S.C. § 363(a). *In re Princeton Overlook,* 143 B.R. 625, 632 (Bankr.D.N.J.1992); *Midlantic Bank v. Sourlis,* 141 B.R. 826, 836 (D.N.J.1991). Under §§ 363(c)(2) and (e) a secured creditor has a right to adequate protection from debtor's use of the rents in bankruptcy. *Sourlis,* 141 B.R. at 836. If a creditor objects to debtor's use of cash collateral then the bankruptcy court "shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). "Adequate protection," as defined in 11 U.S.C. § 361, is normally provided in the form of cash payments (§ 361(1)), or a replacement lien (§ 363(2)), or the "indubitable equivalent of such entity's interest in such property." (§ 363(3)) [13]. The Supreme Court has liberally interpreted "indubitable equivalent" and rejected a creditor's attempt to confine the term to reimbursement for the use value of the collateral plus interest. *US Savings Assoc. of Texas v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 378, 108 S.Ct. 626, 634, 98 L.Ed.2d 740 (1988).

In the context of assigned rents as cash collateral, one court has noted,

> It is obvious that the movants are in no real danger at this stage of not being covered in full with regard to their secured debt. This is true because rentals, uniquely among cash collateral categories, have the additional dimension of the real property mortgage reaching an equity cushion in the underlying real property to safeguard the secured debt. In my view the language "as is necessary" in § 363(e) can appropriately be construed to take into account the unique situation of rents-as

distinguished from the other types of cash collateral that have no such underlying protection.

*In re Rancourt,* 123 B.R. 143 (Bankr.D.N.H. 1991).

 This court finds that FFB has been provided with the "indubitable equivalent" of the value of its cash collateral by using the rents to complete the sewer hook-up. The sewer hook-up is a property improvement which increases the value of the property. While the increase has not been professionally quantified, in this case, where the properties are not marketable without the sewer connection, the increase in value to the property is infinite. At the very least, the increase in value is equivalent to the amount spent funding the hook-up.

This court finds that FFB has been provided with the indubitable equivalent of its interest in the cash collateral used to fund the sewer hook-up and is therefore adequately protected. Thus, the debtor's use of cash collateral was proper under 11 U.S.C. §§ 363(c) and (e). FFB has no likelihood of success on the merits.

### 2. Irreparable Harm

 FFB also cannot show that it will be irreparably harmed. FFB claims that once the rents are used to fund the sewer project, they will not be returned. However, as this court found above, FFB is being provided with the indubitable equivalent of the rents since the value of its secured property will be increased. Thus, there is no irreparable harm.

### 3. Harm to Other Interested Parties

In balancing the equities, this court finds that other interested parties will suffer far more harm if the cash collateral is not used than any potential injury to FFB. Debtor will be severely harmed if the sewer project is not completed. Debtor's reorganization plan is contingent upon sale of the condominium units (this court found a likelihood of successful reorganization which is in pros-

13. "Indubitable equivalent" is derived from Learned Hand's opinion in *In re Murel Holding Corp.,* 75 F.2d 941 (2d Cir.1935). Although the term has survived, Hand's definition of "indubi-

table equivalent" in *Murel* has been modified. *See US Savings Assoc. of Texas v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 377, 108 S.Ct. 626, 633, 98 L.Ed.2d 740 (1988).

pect, thus the plan is confirmable). Absent the sewer hook-up no certificates of occupancy will be issued and the apartments will be unmarketable. Thus the harm to debtor is that it will be unable to reorganize. The harm to the public will be discussed below.

### 4. *Harm to the Public Interest*

This court rejects FFB's argument that there is no harm to the public interest. Completion of the sewer hook-up is of incredible importance to the public. The improper discharge of sewerage is a danger to the public health, particularly the citizens of the Township of North Bergen (a highly populated area) and the State of New Jersey. Any delay is a significant health hazard. This court finds FFB's argument that there is no urgency to remedy the flow of raw fecal matter because it has occurred for several years to be cynical. The whole idea of public health is that when one finds a continuing health hazard, one must remedy it. Failure to do so is more than bad government, it is criminal. The positions stated by the Township of North Bergen, MUA, and NJDEP attest to the importance and the urgency of the completion of this project.

### CONCLUSION

In balancing the equities, this court finds that FFB has not met the standards for a stay pending appeal. FFB has no likelihood of success on the merits because the assigned rents are property of the estate and are properly used as cash collateral. There is no irreparable harm to FFB if this motion is not granted, rather the other interested parties will be more harmed. The public interest is overwhelmingly and irrebuttably supported and enhanced by this ruling.

FFB's motion is thus denied. An order has been entered.